UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARIANA BLANCHE, A MINOR, BY LATOYA BLANCHE, GUARDIAN OF ARIANNA BLANCHE,<br><br>PLAINTIFF,<br><br>v.<br><br>UNITED STATES OF AMERICA AND SILVER CROSS HOSPITAL AND MEDICAL CENTERS,<br><br>DEFENDANTS. | No. 12 C 7332<br><br>Judge Thomas M. Durkin |

## MEMORANDUM OPINION AND ORDER

Arianna Blanche, by her guardian and mother, Latoya Blanche,[1] has sued the United States under the Federal Tort Claim Act ("FTCA") for injuries that she sustained during her delivery. The United States has moved for summary judgment, arguing that she filed her medical malpractice claim after the FTCA's two-year statute of limitations had expired. For the following reasons, the Court grants the government's motion.

## BACKGROUND

During her pregnancy with Arianna, Latoya received prenatal care at the Will County Community Health Center ("WCCHC") from Dr. Buthaina M. Jabir, Sue Mersch, and Christine Lukanich. R. 73-1 ¶ 3. Latoya was admitted to Silver Cross Hospital and Medical Center ("Silver Cross") on September 2, 2008, where she gave birth to Arianna on September 4, 2008. *Id.* at ¶ 4. Dr. Husam Marsheh, a

---

[1] The Court will refer to the plaintiff as "Blanche" except when context requires the Court to distinguish Arianna from her mother.

doctor affiliated with WCCHC, delivered the baby. *Id.*[2] Arianna was unusually large at birth (11.7 lbs.), a condition known as macrosomia. *Id.* at ¶ 5. During the delivery, Arianna's body became lodged in the birth canal after her head emerged (shoulder dystocia). *Id.* at ¶ 6; *see also id.* at ¶ 10 (Latoya felt as if the baby's "head was out, but her body wasn't."). The baby was lodged for what "seemed like" 20 minutes to Latoya, but was probably less. R. 73-1 ¶ 11. She was frightened that she would lose the baby. *Id.* at ¶ 13.

While he was delivering the baby, Dr. Marsheh "hollered" at the nurses, "in a tone that sounded like he was upset," "[w]ho was her doctor? Who was her doctor? Find out who her doctor was." *Id.* at ¶ 20.[3] Latoya assumed that he was referring to her prenatal doctor. *Id.* at ¶ 21. Her testimony about her contemporaneous understanding of why he was asking about her prenatal doctor is somewhat unclear. At one point in her deposition, Latoya clearly states that she understood *at the time* that Dr. Marsheh wanted to know why her prenatal doctors hadn't notified him that the baby was too large for a vaginal delivery:

> Q. And as far as what your understanding at the time was, why did you understand that he wanted to know the answer to that?

---

[2] The government contends that Dr. Marsheh was an employee of WCCHC. R. 73-1 ¶ 3. Blanche states that he worked as an independent contractor. *Id.* The government has certified that, during the relevant time period, Dr. Marsheh was a federal employee for the FTCA's purposes. R. 68-3 at 17. The status of his employment under state law is irrelevant. *See Alinsky v. U.S.*, 515 F.3d 639, 465 (7th Cir. 2005).

[3] Blanche contends Dr. Marsheh demanded to know who her doctor was after the delivery. R. 85 ¶ 12. The testimony she cites, however, indicates that he posed this question to the nurses while Latoya "was going through the delivery." R. 68-1 at 116.

> A. Because – I guess because he wanted to know that – he wanted to know, like, who took care of her while she was pregnant, because that was my first time I was seeing Dr. Marsheh, at the hospital. He – Dr. Marsheh never seen me. That was my first time ever seeing him, at the hospital, and maybe – I just felt like maybe he want to know details, like did they know that this was an enlarged baby or anything like that. Like did they even put it in the records? Why didn't they – didn't record this, that this was going to be a large baby, that he needs a C-section.
>
> I mean, from my perception. That's what I was thinking, like maybe he want to know why didn't nobody know that this baby was large? So I am not sure.

R. 68-1 at 117. She later testified that she knew that Dr. Marsheh was troubled by the baby's size, but did not know what that had to do with her prenatal doctor. *Id.* at 120. After trying several different delivery positions at Dr. Marsheh's direction, Latoya heard "like a popping sound or something, and then the next thing you know she was coming out." *Id.* at ¶ 14. She testified that there was a lot of activity in the room after the delivery, and that she was upset:

> So then the next thing you know – I know, a lot of other people came in the room, like I don't know who they was, but other people came in the room. So he got her out, and they put her in a thing [incubator]. And I was like, what's wrong with my baby? What's wrong with my baby? Then the doctor was like, let me work on her. Let me work on her. Let me work on her, and then I was crying, and then there was a nurse by me like, she's gonna be okay. She gonna be okay. Everything is going to be alright. She is going to be fine, and then I just heard my baby crying, and they rushed her out of the room, and Dr. Marsheh stitched – stitched me up.

R. 68-1 at 58-59; *see also* R. 73-1 ¶ 8.

Following the birth, Latoya saw Arianna in Silver Cross's intensive care room wearing a splint on her right arm. R. 73-1 ¶ 15. Initially, Arianna was unable to

move her right arm at all. *Id.* at ¶ 16. Latoya asked Dr. Marsheh: "why has she got this on? What's wrong with her arm and they told me." *Id.* at ¶ 17.[4] At some point, possibly in the context of this discussion, and at any rate, during her recovery at Silver Cross: (1) someone told Latoya that Arianna had a condition called Erb's palsy, *id.* at ¶¶ 17, 23;[5] and (2) Dr. Marsheh apologized to her. "It was like, I'm sorry about the delivery of your baby and stuff like that." *Id.* at ¶ 18. Latoya believed that Dr. Marsheh was apologizing for Arianna's injury:

> Q. Tell me as closely as you can what exactly Dr. Marsheh said to you when he came in and apologized to you.
>
> A. He was just saying that he was sorry, and I assumed that he was sorry for the birth of my baby and how that she was delivered.
>
> Q. Okay. And that was because of the injury to her arm?
>
> A. Yes.

R. 68-1 at 107.

After Latoya came home with Arianna, her friends, family, and co-workers asked her about her baby's injury and whether she intended to file a lawsuit:

> [E]verybody seen her arm, and then that's when I was talking to people. They were like, you got a lawsuit? You got a lawsuit? You got a lawsuit? Like I go different places like people like – places where people work and stuff, they be like, oh, what happened to your baby, because it was very notable. What happened to your baby? And all this other stuff like, you got a lawsuit? You got a lawsuit?

---

[4] Latoya testified at her deposition that she asked "him" (Dr. Marsheh) why her daughter was wearing a splint. R. 68-1 at 107-08. Her reference to "they" in this context is unclear. *Id.* at 108.

[5] Latoya only later learned that Erb's palsy involves nerve damage in the shoulder. R. 73-1 ¶¶ 17, 23.

*Id.* at 132-33; R. 73-1 ¶ 24. Within a week or two after the birth, Latoya met with a lawyer about suing the hospital for Arianna's injury. R. 73-1 ¶ 26. She did not file a lawsuit at that time because "to [her] he wasn't a good lawyer." *Id.* at ¶ 27; R. 68-1 at 129. Approximately a year later, she saw a television commercial advertising legal services. R. 73-1 ¶ 28. The commercial gave viewers a phone number to call if their child had been diagnosed with Erb's palsy. *Id.* Latoya called the number and was eventually referred to her current counsel, whom she retained in August 2009. *Id.* at ¶ 29. On May 4, 2011, she filed a lawsuit in state court against her prenatal caregivers (Dr. Jabir, Mersch, and Lukanich), Dr. Marsheh, WCCHC, and Silver Cross. *Id.* at ¶ 30. The United States removed the case to federal court on the ground that the individual defendants were acting within the scope of their employment with WCCHC, a private entity that receives grant money from the Public Health Service pursuant to 42 U.S.C. § 233. *Id.* at ¶ 31; *see also Blanche v. Silver Cross*, 11 C 8487 (N.D. Ill. 2011) (Zagel, J.) (R. 1). The court granted the government's motion to dismiss for failure to exhaust administrative remedies, and remanded Arianna's claim against Silver Cross to state court. R. 73-1 ¶ 32. On February 10, 2012, Arianna filed an administrative claim with the U.S. Department of Health and Human Services ("HHS") seeking $30,000,000 in damages. *Id.* at ¶ 33; R. 39 ¶ 4. HHS denied her administrative claim because she had not filed it before the FTCA's two-year statute of limitations expired. R. 73-1 ¶ 34; *see also* 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years

after such claim accrues . . . ."). HHS further concluded that the FTCA's savings clause, 28 U.S.C. § 2679(d)(5), was inapplicable because Blanche had filed her state-court complaint more than two years after her claim accrued. R. 73-1 ¶ 35.[6] She filed this case against the United States and Silver Cross on September 13, 2012. *Id.* at ¶ 36.

Blanche alleges that her prenatal caregivers negligently allowed Latoya to deliver her fetus vaginally, and negligently failed to: (1) diagnose macrosomia; (2) appropriately evaluate and examine Latoya to assess the size of her fetus; (3) offer her the option of having a C-section; (4) "correlate" a week 37 ultrasound with a clinical examination; and (5) notify Latoya about the risks associated with delivering a large fetus vaginally. R. 39 ¶¶ 32, 34-36. Her claim against Dr. Marsheh is based upon some of the same allegedly negligent acts (e.g., failing to diagnose macrosomia), and she further alleges that he "performed inappropriate maneuvers," and "applied excessive traction" on Latoya's abdomen, during the delivery. *Id.* at ¶ 33.

---

[6] "Whenever an action or proceeding in which the United States is substituted as the party defendant under this subsection is dismissed for failure first to present a claim pursuant to section 2675(a) of this title, such a claim shall be deemed to be timely presented under section 2401(b) of this title if–

(A) the claim would have been timely had it been filed on the date the underlying civil action was commenced, and

(B) the claim is presented to the appropriate Federal agency within 60 days after dismissal of the civil action." 28 U.S.C. § 2679(d)(5).

## LEGAL STANDARD

The United States has moved for summary judgment on Blanche's negligence claim. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ANALYSIS

The government argues that Blanche's claim accrued in September 2008, making her suit untimely by approximately eight months. Blanche argues that her claim accrued in August 2009, when she saw the television commercial regarding Erb's palsy and retained her current counsel. Alternatively, she argues that the Court should equitably toll the statute-of-limitations because WCCHC's federally-funded status was not apparent in available records prior to her filing the initial state-court complaint.

I.   **Statute of Limitations**

The FTCA gives district courts jurisdiction over tort claims arising from the acts and omissions of federal employees within the scope of their federal employment. *See* 28 U.S.C. § 1346(b). State law governs the merits of the plaintiff's tort claim, *see Kaniff v. United States*, 351 F.3d 780, 790 (7th Cir. 2003), but federal law governs when the claim accrues. *See Arroyo v. United States*, 656 F.3d 663, 668 (7th Cir. 2011). "[A] plaintiff's medical malpractice claim against the federal government accrues when either (1) the individual becomes subjectively aware of the government's involvement in the injury, or (2) the individual acquires information that would prompt a reasonable person to inquire further into a potential government-related cause of the injury, whichever happens first." *E.Y. ex rel. Wallace v. United States*, 758 F.3d 861, 866 (7th Cir. 2014). Throughout her brief, Blanche confuses the terms "government-related cause" and "doctor-related cause" with "negligence" and "wrongdoing." R. 73 at 12-16, 20-22, 25-26.[7] A claim accrues when the "plaintiff kn[ows] enough (or should have known enough)" to suspect a "doctor-related" cause, whether or not the plaintiff suspects negligence.

---

[7] In *E.Y.*, Seventh Circuit distinguished between "doctor-related" causes and "government-related" causes because the plaintiff filed claims against the private hospital that delivered her child and the federally-funded clinic that provided her prenatal care. *See E.Y.*, 758 F.3d at 866 (noting that cases like *Arteaga* and *Arroyo* used the terms "doctor-related" and "government related" interchangeably because in those cases the government was the only institution that treated the plaintiff). Blanche has sued a private hospital (Sliver Cross), but unlike *E.Y.*, her claim against the private defendant is based upon the same conduct underlying her claim against the United States as Dr. Marsheh's employer. So, in this case, "doctor-related" and "government-related" amount to the same thing.

*Arroyo*, 656 F.3d at 673 (citing *United States v. Kubrick,* 444 U.S. 111, 123 (1979)); *see also Arteaga v. United States*, 711 F.3d 828, 831 (7th Cir. 2013). "[A]rmed with such knowledge the prospective plaintiff should be able to discover within the statutory limitations period the rest of the facts needed for drafting a complaint that will withstand a motion to dismiss." *Arteaga*, 711 F.3d at 832.

> The facts in *Arteaga* are very similar to the facts in this case:
>
> The suit accuses the Erie Family Health Center, where the mother received prenatal care, of neglecting symptoms indicating that at birth the baby would weigh too much for a vaginal delivery to be safe, and of failing to advise the mother to have, therefore, a Caesarean section instead. In the course of the vaginal delivery the baby's shoulder became stuck in the mother's pelvis (the condition known as shoulder dystocia) because the baby was oversized (she weighed 11 pounds). During the delivery nerves in the baby's shoulder were injured (what is called a brachial plexus injury), resulting in a limited range of movement in her right arm, a condition that apparently has persisted.

*Id.* at 830. Several months after the delivery in July 2004, her mother obtained the child's medical records and consulted a lawyer. *Id.* The lawyer told her that he did not believe that she had a viable claim. *Id.* She consulted another attorney 15 months later, who agreed to represent her, but then withdrew after 16 months. *Id.* Fourteen months after that, she sought and retained an attorney to take her case. *Id.* In March 2010, more than five years after her child was born, she sued the clinic and the nurses who had provided her prenatal care in Illinois state court. *Id.* The government removed the case to federal court and obtained a dismissal without prejudice because the plaintiff had not exhausted her administrative remedies. *Id.* at 830-31. After HHS effectively denied her administrative claim, she refiled her lawsuit in federal court. *Id.* at 831. The district court dismissed her claim. On

appeal of the district court's order dismissing her claim as untimely, the plaintiff argued that her claim accrued in December 2009 when she obtained a medical opinion attributing her child's injury to the clinic's negligence. *Id.* at 831; *see also Arteaga v. United States*, No. 10 C 7767, 2012 WL 32983, at *2 (N.D. Ill. Jan. 6, 2012). The Seventh Circuit disagreed: "all that is required to start the statute of limitations running is knowledge of the injury and that the defendant or an employee of the defendant acting within the scope of his or her employment may have caused the injury." *Arteaga*, 711 F.3d at 831. Applying that standard, the court held that the plaintiff's claim accrued shortly after she gave birth, at which point she knew that her child was injured, formed the suspicion that the clinic was at fault, and sought legal counsel. *Id.* at 831.

### A. Blanche's Claim Against Dr. Marsheh

Applying *Arteaga*, Arianna's claim against Dr. Marsheh is clearly time-barred. Latoya knew that her child was injured shortly after the delivery when she saw Arianna's arm in a splint, and she received the Erb's palsy diagnosis before the hospital discharged her. It is irrelevant whether she knew at that time that Erb's palsy refers to nerve damage; she knew that her child was injured and she had a diagnosis that ought to have prompted further inquiry. The fact that Dr. Marsheh told her that "he was sorry for the birth of [her] baby and how that [sic] she was delivered" strongly suggests that the cause of Arianna's injury was "doctor-related" rather than natural. R. 68-1 at 107. In her brief, Blanche attempts to characterize Dr. Marsheh's statement as "nothing more than an expression of sympathy." R. 73

at 11. On the contrary, Latoya consistently testified at her deposition that Dr. Marsheh "apologized." R. 68-1 at 69-71, 115-16. The fact that she consulted a lawyer within a few weeks after the delivery undermines her argument that she believed Dr. Marsheh was merely sympathizing with her about an unpreventable accident. She did not file a lawsuit at that time because she was not impressed with the lawyer she consulted, not because she hadn't yet formed the suspicion that her daughter's injury was "doctor-related." Even if the Court accepts Latoya's argument that she did not suspect that Dr. Marsheh caused the injury, a reasonable person would have inquired further. Arianna, like the child in *Arteaga*, weighed more than 11 pounds at birth. She became lodged in the birth canal for an extended period of time. Latoya knew that her daughter was injured during the delivery, and Dr. Marsheh apologized to her for "how" he delivered the baby. Common sense dictates that Arianna would not have become lodged, and would not have been injured, if Dr. Marsheh had delivered her via C-section.

### B. Blanche's Claim Against Her Prenatal Caregivers

Blanche emphasizes that her claim against her prenatal caregivers is distinct from her claim against Dr. Marsheh, citing *E.Y.*, 758 F.3d at 867-68 and *Goodhand v. United States*, 40 F.3d 209 (7th Cir. 1994). In *E.Y.*, doctors affiliated with a private hospital removed the plaintiff's baby (E.Y.) via C-section after a difficult delivery. *E.Y.*, 758 F.3d at 863. E.Y. was born "limp and purple," and a doctor later told his mother that he "might have suffered oxygen deprivation during delivery." *Id.* at 863-64. E.Y. was later diagnosed with diplegic cerebral palsy. *Id.* at 864. At no

point during this process did anyone suggest that her child's injuries could have been caused by complications while she was receiving prenatal care at a federally-funded clinic. *Id.* After retaining counsel, her attorney requested medical records from the private hospital and the clinic. *Id.* According to the plaintiffs, the documents revealed for the first time that her prenatal care may have contributed to her child's injury. *Id.* at 868. If so, then she filed her suit shortly before the statute of limitations expired. *Id.* at 864. The district court concluded that her claim accrued earlier and dismissed her claim as untimely. *Id.* at 864-65. The Seventh Circuit reversed. The plaintiff in *E.Y.* had grounds to suspect a doctor-related cause for her child's condition shortly after delivery. *Id.* at 863-64. But that suspicion was based on procedures performed by doctors affiliated with a private hospital. *Id.* The Seventh Circuit rejected the government's argument that "any doctor-related cause for an injury should trigger the statute of limitations as to all doctor-related causes for that injury, private or governmental." *Id.* at 866-67. It analogized the case to *Goodhand*, 40 F.3d at 215, in which the court held that accrual as to one doctor-related cause (in that case, a perineal tear related to a vaginal delivery) did not trigger accrual as to a second cause (a botched surgery to repair the perineal tear). The *E.Y.* court held that the two alleged causes for plaintiff's child's injury—one prenatal, the other delivery-related—were too remote in time, place, and circumstances to find that the accrual of one claim triggered accrual of the other. *E.Y.*, 758 F.3d at 868. Viewed independently, and in the light most favorable to the

plaintiff, her claim with respect to her prenatal care did not accrue until she obtained records from the government-funded clinic. *Id.* at 868-69.

The Court agrees with Blanche that the accrual of her claim against Dr. Marsheh did not, standing alone, trigger the accrual of her claims against her prenatal caregivers. *See id.* ("[C]laims that are distinct in time, or distinct in place, or that relate to a different injury do not accrue *solely on that basis*.") (emphasis added). Nevertheless, unlike the plaintiff in *E.Y.*, Latoya possessed facts shortly after Arianna's birth that would have prompted a reasonable person to investigate whether her prenatal care had contributed to her child's injury. Arianna was very large at birth. None of her prenatal caregivers, however, told her the child's estimated weight, or discussed with her the option of delivering the baby by C-section. R. 85 at ¶ 5. Arianna became lodged in the birth canal during delivery, an event suggesting that she should *not* have been delivered vaginally. Also, Dr. Marsheh "hollered" at the nurses during the delivery, "[w]ho was her doctor? Who was her doctor? Find out who her doctor was." R. 73-1 at ¶¶ 20-21. Latoya testified that she understood, at that time, that Dr. Marsheh was upset because her prenatal caregivers had not noted the fetus's large size. R. 68-1 at 117. Even if the Court disregards this testimony in light of her later statement that she did not understand the connection between her prenatal doctor and the baby's size, *id.* at 120, she consistently testified that: (1) Dr. Marsheh loudly demanded to know who her doctor was in an upset tone of voice; and (2) he was concerned about the baby's size. *See id.* at 118-19 ("Q. Right. Well, I understand that part, but I mean, why –

what did you think he was upset about? A. How the baby was delivered, the size."); *see also id.* at 120 ("I believe that he was troubled by the size of my baby."). This information, coupled with difficult delivery and her child's injury/diagnosis, would have prompted a reasonable person to investigate whether her prenatal caregivers' conduct contributed to her injury. *See E.Y.*, 758 F.3d at 866; *Arteaga*, 711 F.3d at 831.

In sum, the Court concludes that Blanche's claims against the United States accrued sometime in September 2008. She filed her state-court lawsuit eight months too late for 28 U.S.C. § 2679(d)(5) to salvage her claim.

## II. Equitable Tolling

The Seventh Circuit has held that courts may equitably toll the FTCA's statute of limitations. *Arteaga*, 711 F.3d at 833. "Equitable tolling is available to a plaintiff who has pursued her rights diligently and points to an extraordinary circumstance that prevented timely filing." *Smith v. EMB, Inc.*, 576 Fed. Appx. 618, 619 (7th Cir. 2014); *see also Santos ex rel. Beato v. United States*, 559 F.3d 189, 197-98 (3d Cir. 2009) (applying a similar standard in an FTCA medical malpractice case). The record does not support Blanche's claim that she diligently investigated WCCHC's federally-funded status. The Court sympathizes with Latoya's predicament, and would not expect even a highly-educated layperson to know whether a clinic receives federal funds and, if so, appreciate the legal consequences. *Cf.* R. 85 at ¶¶ 1-2. But she did nothing to pursue her claim for almost a year after contacting an attorney. After she retained counsel in August 2009, her attorneys

still had 13 months to investigate. "It's not asking too much of the medical malpractice bar to be aware of the existence of federally funded health centers that can be sued for malpractice only under the Federal Tort Claims Act." *Arteaga*, 711 F.3d at 834; *see also A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 145 (2d Cir. 2011) ("It is hard to understand why any lawyer—let alone a lawyer at a firm specializing in medical malpractice with specific prior acquaintance with this issue—would not investigate the federal nature of potential defendants as part of standard due diligence in every medical malpractice case."). There is no evidence that Blanche's counsel contacted WCCHC or HHS to inquire whether the clinic receives federal funds. As *Arteaga* noted, HHS maintains a database of federally-funded community health centers. *Arteaga*, 711 F.3d at 834. That database, or something like it, has been in place since at least February 2008. *See A.Q.C. ex rel. Castillo v. United States*, 715 F. Supp. 2d 452, 455-56 (S.D.N.Y. 2010) (stating that in February 2008 plaintiff's counsel "conducted an internet search that led her to a hotline number, 866–382–2435 (866–FTCA–HELP), which informed her that UHP had been deemed a federal health clinic."). There is no evidence that counsel consulted the database. Instead, he searched Westlaw's business-registration database and the Illinois Secretary of State's website. R. 85 at ¶ 27. Predictably, those state records did not disclose WCCHC's federally-funded status. Finally, Blanche's attorney received an invoice from WCCHC for medical records in January 2010—eight months before the limitations period expired—prominently stating that WCCHC is "A Federally Qualified Health Center." *Id.* at ¶ 23; R. 73-9 at 1. That

same disclosure appeared on the clinic's website from that time period. *See* R. 73-10 at 3 (identifying WCCHC as a "Federally Qualified Health Center"). A reasonably diligent search would have disclosed WCCHC's federally-funded status. *See Arteaga*, 711 F.3d at 834-35 (rejecting equitable tolling claim on similar facts); *Motley v. United States*, 295 F.3d 820, 824 (8th Cir. 2002) ("To toll the statute because of a plaintiff's ignorance of the defendant's federal employee status, plaintiff "must at the very least show that the information *could not* have been found by a timely diligent inquiry . . . .") (quoting *Gonzalez v. United States,* 284 F.3d 281, 291 (1st Cir. 2002) (emphasis in original)).

Finally, the Court rejects Blanche's assertion that she "and her counsel had no information linking" Dr. Marsheh to WCCHC. R. 73 at 5, 29. Blanche cites internet research that her attorney performed on May 5, 2011, *after* she filed her state-court complaint. In that complaint, Blanche alleged that "[a]t all relevant times, defendant, Husam Marsheh, M.D., was the employee and/or agent of [WCCHC], acting within the scope of his authority." R.68-3 at 6. Either counsel had information linking Dr. Marsheh to WCCHC before March 2011, or else he did not have a factual basis for his state-court allegation. Either way, it undermines the case for equitable tolling.

In sum, Blanche has not shown "extraordinary circumstances" that would warrant equitable tolling.

## CONCLUSION

The Court grants the United States' motion for summary judgment, R. 66. The Court will rule by mail on Silver Cross's pending motion for summary judgment, R. 63.

ENTERED:

*Thomas M Durkin*
Honorable Thomas M. Durkin
United States District Judge

Dated: March 17, 2015